**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| THE ESTATE OF EMMA PRASSENOS,<br>deceased, by and through its Administrator,<br>Ronald Jeffery Hester,<br>     Plaintiff,<br><br>v.<br><br>E.I. duPONT de NEMOURS and CO, and<br>BENEFLEX EMPLOYEE LIFE INSURANCE<br>PLAN of E.I. duPONT NEMOURS and CO.,<br>     Defendants.[1] | )<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 13-00419-KD-C<br>)<br>)<br>)<br>)<br>) |

**ORDER**

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Docs. 32-36, 38), Defendants' Response (Doc. 41, 42, 44), and Plaintiff's Reply (Doc. 46); Defendants' Motion for Summary Judgment (Docs. 50-53), Plaintiff's Response (Doc. 56) and Defendants' Reply (Doc. 57); and Court Orders (Docs. 64, 65), Defendants' Responses (Docs. 67, 68), Plaintiff's Second Amended Complaint (Doc. 66), and Plaintiff's Response (Doc. 69).[2]

### I.    Findings of Fact[3]

This case against E.I. DuPont De Nemours and Co. (DuPont) and the Beneflex Employee Life Insurance Plan of E.I. DuPont De Nemours and Co. (Life Insurance), concerns a spouse's claim for $100,281 in additional life insurance benefits from her late husband's policy; and

---

1  Plaintiff did not sue the BeneFlex Dependent Life Insurance Plan and thus, that plan is not a defendant.

2  While the parties moved for summary judgment on Count 3, this Count was dismissed by Court order per Doc. 65 and thus the parties' motions as to this Count are **MOOT**.

3  On summary judgment, the Court must "resolve all issues of material fact in favor of the [non-movant], and then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts." McDowell v. Brown, 392 F.3d 1283, 1288 (11th Cir. 2004).

cancellation of her $100,000 Beneflex Dependent Life Insurance Plan (Dependent Life Insurance) and a demand for reinstatement of same. After exhausting her administrative remedies, Prassenos filed a Complaint in this Court asserting a claim for recovery of ERISA welfare benefits,[4] pursuant to Section 1132(a)(1)(B), against both Defendants; and a breach of fiduciary duty claim, pursuant to Section 1132(a)(3), against DuPont.

Emma Prassenos (Prassenos) was married to Mr. William Prassenos (Mr. Prassenos) for 30 years before he passed away on August 9, 2012.   (Doc. 33 (Aff. Prassenos)). Mr. Prassenos was employed with ChemFirst, Inc. (ChemFirst) from April 1983 to June 1, 2012. (Doc. 33 (Aff. Prassenos); Doc. 42-1 at 1 (Aff. Bilson);[5]  Doc. 30 at 3). While Mr. Prassenos' was employed, in 2002, DuPont acquired ChemFirst. (Doc. 42-1 at 1 (Aff. Bilson; Doc. 42-2 at 156). DuPont's acquisition did not change the post-retirement benefits available to ChemFirst employees, such that ChemFirst employees and DuPont employees had different benefits both before and after DuPont's acquisition.   (Doc. 42-1 at 1-2 (Aff. Bilson)).[6]

As an employee, Mr. Prassenos' participated in the DuPont BeneFlex Employee Life Insurance Plan (Life Insurance plan),[7] and was provided with life insurance "1x pay" paid by the

---

4  DuPont is the Administrator of the welfare benefit plans.   (Doc. 30 at 3-4; Doc. 42-2).

5  Bilson is DuPont's representative. Bilson was a 40 year plus employee with DuPont when she retired in March 2013, as well as a former Benefit Consultant and Delegate of the DuPont Benefit Appeals Committee and participant in the committee's determination of Prassenos' claim and appeal. (Doc. 42-1 at 1 (Aff. Bilson)).

6  ChemFirst employees are not eligible for retirement benefits available to DuPont employees under the DuPont Pension and Retirement Plan (PRP).   (Id. at 2 (Aff. Bilson)). Even though the ChemFirst Pension later merged into the DuPont PRP, ChemFirst employees have separate and different pension benefits under the ChemFirst Pension, which is maintained as a separate section, Title V, within the DuPont PRP.   (Id.)  Thus, ChemFirst retirees are not eligible for the same benefits DuPont retirees receive (e.g., life insurance).   (Id.)

7  While called the DuPont life insurance plan, the summary of the plan (SPD) states that "[a]ll references to 'the Company' in this document pertain to the specific company that employs you."   (Doc. 42-2 at 74, 95).   The full plan specifies: "The term 'Company' means E. I. du Pont de Nemours and Company, any wholly owned

company so long as his employment continued. (Doc. 42-1 at 3-4 (Aff. Bilson; Doc. 30 at 3; Doc. 34 at 5-26 (SPD), 47-58 (full plan); Doc. 42-2 at 72-92). Mr. Prassenos purchased *additional* coverage, "2x pay." (Id.) Prassenos was Mr. Prassenos' beneficiary.   (Doc. 30 at 3).

Mr. Prassenos also participated in the DuPont BeneFlex Dependent Employee Life Insurance plan[8] (Dependent Life Insurance plan), through which he selected $100,000 in coverage on Prassenos' life.   (Doc. 42-1 at 3-4 (Aff. Bilson); Doc. 30 at 3; Doc. 34 at 30-45 (SPD), 60-64 (full plan); Doc. 42-2 at 93-108). Mr. Prassenos was Prassenos' beneficiary.   (Id.)

On April 3, 2012, DuPont mailed the Total and Permanent Disability Income Plan (T&P) Summary Plan Description (SPD)[9] to Mr. Prassenos.   (Doc. 34 at 66-68; Doc. 42-1 at 4 (Aff. Bilson); Doc. 42-2 at 56-71). The T&P SPD provides an employee is automatically enrolled in the disability plan on the date of eligibility, and states as follows:

---

subsidiary or part thereof and any partnership or joint venture in which E. I. du Pont de Nemours and Company is joined which adopts this Plan with the approval of the Company, or such person or persons as the Company may designate." (Doc. 34 at 48).   The same applies to the Dependent Life Insurance Plan.   (Doc. 34 at 61).

8 Id.

9 A Summary Plan Description or SPD is meant to summarize the contents of a particular plan, not replace the plan.   Notably, per DuPont, for the plans at issue in this case, "[i]n the event of a discrepancy between this SPD and the Plan document, the Plan document will govern."   (Doc. 34 at 7, 32).   See, e.g., Curran v. Kemper Nat. Servs., Inc., 2005 WL 894840, *4 (11th Cir. 2005) ("Curran's reliance on the SPD clause, "In case of a conflict between this summary and the plan's legal documents, the plan's legal documents control" is misplaced….Even if the two documents were viewed as conflicting…the SPD controls...If the [plan] were silent on the issues…such silence would not create a conflict with the SPD. *See Jensen v. SIPCO, Inc.,* 38 F.3d 945, 952 (8th Cir.1994) (explaining that specific language in one plan document and silence in another does not create a conflict between the two)[]"); Kamlet v. Hartford Life and Acc. Life Ins. Co., 144 Fed Appx. 755, 756 (11th Cir. 2005) ("A plan's summary does not comply with …[ERISA] if it is not an accurate interpretation of the original plan…."ERISA provides that the summary shall be an accurate and comprehensive document that reasonably apprises the employees of their rights under the plan." Id. If there is an inconsistency between the plan and its summary, the summary's interpretation controls. *Id."*); Cone v. Walmart Stores, Inc. Assoc.'s Health and Welfare Plan, 2012 WL 1946503 (M.D. Ga. May 30, 2012) ("the SPD is a critical feature of the ERISA regulatory scheme because it 'simplif[ies] and explain[s] a voluminous and complex document' to plan participants and beneficiaries." … "where a plan participant or beneficiary relies on a provision in the SPD that conflicts with the plan, he or she may enforce the terms of the SPD over the terms of the plan." *Id.[]"*).

This Plan provides income protection in the event you become disabled. Benefits begin the first of the month following your termination if your disability has been found to be total and permanent. Benefits will continue, as long as you remain totally and permanently disabled and continue to meet the requirement of the Plan….

You will need to satisfy the requirements described in this SPD to receive Total and Permanent Disability Income benefits.

(Doc. 42-2 at 58, 59).[10]

On April 9, 2012, Mr. Prassenos was contacted by a MyInfo Service Center representative who discussed the T&P benefits with him.   (Doc. 34 at 66-68; Doc. 42-2 at 1-3).

ChemFirst also sent Mr. Prassenos a letter dated May 2, 2012, an "Informational Notice," which contained details and further calculations and information regarding his retirement/pension benefit from the "Retirement Plan for Employees of ChemFirst Inc."   (Doc. 42-2 at 19-50).   This Notice explained that under the disability provisions of the plan, Mr. Prassenos could choose to commence his benefit any time between his disability date and his normal retirement date, and included an estimate packet "assuming you want to defer your [retirement/pension benefit] commencement to age 65."   (Id. at 19).   On May 31, 2012, a COBRA enrollment packaged was mailed to Mr. Prassenos.   (Doc. 34 at 73).[11]

Mr. Prassenos was diagnosed with cancer and effective June 1, 2012, separated from ChemFirst earning $100,281/year.   (Doc. 30; Doc. 34 at 191, 194).   Mr. Prassenos separated from ChemFirst on disability under DuPont's T&P plan (the disability plan) (versus retired at that time).   (Doc. 42-1 at 4 (Aff. Bilson); Doc. 30; Doc. 41 at 4).   Because Mr. Prassenos

---

10 Eligibility under the T&P is based on, per the SPD, being: a Full-Service Employee of DuPont U.S. Region; a Full-Service Employee of a participating DuPont subsidiary or joint venture that elects to adopt this Plan. (Id. at 56-71).

11   DuPont contends that a life insurance conversion notice was included.   However, there is no evidence to support this contention.

4

separated from ChemFirst on disability under the T&P disability plan, his retirement would later take effect and would be governed by Title V of the DuPont Pension and Retirement Plan (PRP) (Doc. 42-2 at 109-232), but _not_ the entire PRP:

> Effective December 31, 2007 …. the Retirement Plan for the Employees of ChemFirst, Inc. were merged into the Plan.   The Plan was amended effective January 1, 2008 to add Title IV and Title V …. Title V consists of the provisions of the Retirement Plan for the Employees of ChemFirst, Inc. in effect on January 1, 2008.

(Id. at 112). Title V is the "Retirement Plan for Employees of ChemFirst, Inc." (Id. at 155-232).[12]

Following Mr. Prassenos' separation from ChemFirst on disability, the couple received a June 1, 2012 DuPont "Confirmation of Lost Coverage" letter notification which indicated that because Mr. Prassenos lost his eligibility (as he was no longer an active employee), the benefits coverage had been cancelled and ended officially on May 31, 2012[13] (_i.e._, that both Mr. Prassenos' "2x pay" life insurance, and Prassenos' $100,000 dependent life insurance canceled). (Doc. 33 at 3 (Aff. Prassenos); Doc. 34 at 79; Doc. 38 at 15; Doc. 42-2 at 54).   According to Prassenos, as a result of receiving this letter, neither she nor her husband contacted the insurance company (Prudential) or paid any monthly premiums "since the letter did not inform us that we could continue our life insurance, despite our desire to do so, because we were both diagnosed with cancer. We did continue with medical coverage."   (Id.)

On August 9, 2012, Mr. Prassenos died at 58 years old. (Doc. 30 at 3; Doc. 34 at 184).

According to DuPont, as Mr. Prassenos separated from ChemFirst under DuPont's T&P

---

12  This distinction makes clear that ChemFirst retirees are treated differently than DuPont retirees, as a specific section was carved out of the DuPont PRP to govern ChemFirst retirees. Mr. Prassenos separated from ChemFirst on disability (to then later retire).   As a ChemFirst employee, once he became eligible for retirement (for age, etc.) he would be subject to Title V of DuPont's PRP, which addresses former ChemFirst employees.

13  The parties dispute this date, varying between this and June 1, 2012, and moreover, Prassenos contends July 31, 2012 should be the earliest date of coverage ending per the plan's terms.

plan as a ChemFirst disabled employee, he received "1x pay" life insurance ($100,281), and so

DuPont paid Prassenos that benefit.   (Doc. 42-1 at 4 (Aff. Bilson); Doc. 41 at 4).   See also

(Doc. 42-2 at 60).   However, Prassenos sought the "2x his pay" life insurance benefits from the

Defendants and the ability to continue her dependent life insurance, which was denied.

On September 18, 2012, DuPont denied Prassenos' Level 1 Appeal concerning the

amount of life insurance in which Mr. Prassenos was enrolled, and the claim that he had wished

to continue the Dependent Life Insurance for Prassenos.   (Doc. 34 at 66-68; Doc. 42-2 at 1-3).

Specifically, DuPont explained its decision and quoted certain provisions from Page 3 of the

T&P SPD, and from Page 12 of the Life Insurance SPD, as the denial basis, as follows:

> This letter is in response to your Level 1 Appeal received on September 17, 2012,
> appealing the amount of life insurance in which your husband, William Prassenos, was
> enrolled. You state that he was enrolled in 2 x Pay of Employee Life Insurance, not the 1
> x Pay. You also state that he wished to continue Spousal Life Insurance at $100,000.
>
> DuPont has directed the Benefit Determination Review Team to review your Level 1
> Appeal. In reviewing your Level 1 Appeal, we considered the information submitted
> with your written Level 1 Appeal, the records at MyInfo, and the relevant plan
> provisions. Your appeal has been denied.
>
> Records indicate that Mr. Prassenos was enrolled in 2 x Pay of Employee Life Insurance
> as an active employee.   Mr. Prassenos separated from the company on June 1, 2012,
> under the provisions of the Total and Permanent Disability Income Plan (T&P) and his
> Employee Life Insurance was reduced to 1 x Pay as of that date.   Records show that
> he was mailed the 2008 Total and Permanent Disability Income Plan Summary Plan
> Description on April 3, 2012. On the April 9, 2012, he was contacted by a representative
> of the MyInfo Service Center who discussed with him the T&P benefits, including the
> continuation of medical coverage and the reduction of the life insurance. A COBRA
> Enrollment Package was mailed to Mr. Prassenos on May 31, 2012, which would have
> included the life insurance conversion notice. Mr. Prassenos had the right to convert the
> lx Pay of additional life insurance and the Spouse Life Insurance by contacting
> Prudential within 31 days of the loss.   Converted life insurance is maintained and
> premiums are collected directly by Prudential and would not have been part of the
> benefit paid by DuPont.   Mr. Prassenos was correctly enrolled in 1 x Pay of Employee
> Life Insurance that was provided by DuPont as part of the T&P plan; therefore, your

request for coverage to be reinstated at a total of 2 x pay in Employee Life Insurance or to continue Spouse Life Insurance through DuPont is denied.

The following can be found on page 3 of the 2008 Total and Permanent Disability Income Plan Summary Plan Description, in pertinent part:

**If you become disabled and are not eligible for DuPont retiree benefits:**

Life Insurance: The Company provides continued life insurance equal to one times your pay, subject to age reductions at age 65, at no cost to you for as long as you receive Total and Permanent Disability Income payments. Any Contributory Group Life insurance or supplemental life insurance that you purchased under BeneFlex Employee Life Insurance is discontinued upon employment termination.

The following can be found on page 12 of the 2008 BeneFlex Employee Life Insurance Summary Plan Description, in pertinent part:

*Conversion rights*
To exercise your conversion rights, you must be enrolled in BeneFlex Employee Life Insurance Plan coverage at the time of the event that results in the loss of or reduction in coverage. You must contact the insurance company within 31 days of the end of your coverage under this Plan to exercise your conversion rights for BeneFlex Employee Life Insurance Plan coverage.

You may convert the entire amount of your current BeneFlex Employee Life Insurance Plan coverage. Premiums for the converted policy are determined by the insurance company and are based on the amount of coverage, your age and the type of plan you apply for.

Dependent Life Insurance: Your BeneFlex Dependent Life Insurance coverage ends at the end of the month in which you leave the Company, for any reason, including retirement. With some restrictions, your spouse/partner may be eligible to apply for coverage under the portability feature of the Plan if your coverage ends for reasons other than disability.

Your spouse/partner must contact the insurance company within 31 days of the loss of coverage under this Plan to obtain a portability application. The application must be completed within 31 days of the date it is mailed, or the opportunity to port coverage is lost.

(Doc. 42-2 at 1-2 (emphasis in original)).

DuPont concludes Mr. Prassenos terminated on disability under the T&P SPD and relies

7

upon same for the discontinuation of supplemental life insurance upon termination.   DuPont then relies upon the Life Insurance SPD's 31 day conversion requirement (which it claims Mr. Prassenos failed to do) to deny _both_ the additional life insurance _and_ dependent life insurance.

Further, while DuPont did not specifically state that Mr. Prassenos was a "ChemFirst" employee (versus a DuPont employee) in the Level 1 denial, DuPont quoted the portion of the T&P SPD providing for what happens if an employee becomes disabled and is "not eligible for DuPont retiree benefits."   (Doc. 42-2 at 2).

On October 9, 2012, Prassenos' niece/financial advisor, Debbie Morris, faxed a letter to the DuPont Level 2 Appeal Benefit Determination Review Team, responding to the Level 1 appeal decision, detailing the history of the Prassenos' communications with DuPont.   (Doc. 34 at 75).   Per Morris, in addition to DuPont sending the Prassenos couple "incorrect" DuPont (versus ChemFirst) packets, Mr. Prassenos requested paperwork for the right to convert/port his additional life insurance and Prassenos' dependent life insurance but never received any.   (Id.)

On November 2, 2012, DuPont denied Prassenos' Level 2 appeal explaining that when Mr. Prassenos became disabled he was no longer eligible for certain benefits such as life insurance in excess of "1x his pay," and that the dependent life insurance coverage simply ended because he was no longer employed.   (Doc. 42-2 at 4-5).

Specifically, DuPont explained its decision and quoted certain provisions from Page 3 of the T&P SPD, and from Page 8 of the Dependent Life Insurance SPD, as the denial basis, as follows:

> This letter is in response to your Level 2 appeal received in this office on October 10, 2012, appealing to be allowed to make premiums payments for an additional 1 x pay of Employee Life insurance covering your spouse and former DuPont employee, William

8

Prassenos. You are also requesting to continue the Spousal Life Insurance policy that was part of your husband's benefits when he was an active employee. Mylnfo denied the level 1 appeal stating that records indicate that Mr. Prassenos was enrolled in 2 x Pay of Employee Life Insurance as an active employee.   Mr. Prassenos separated from the company on June 1, 2012, under the provisions of the Total and Permanent Disability Income Plan (T&P) and his Employee Life Insurance was reduced to 1 x Pay as of that date.    Records show that he was mailed the 2008 Total and Permanent Disability Income Plan Summary Plan Description on April 3, 2012. On the April 9, 2012, he was contacted by a representative of the Mylnfo Service Center who discussed with him the T&P benefits, including the continuation of medical coverage and the reduction of the life insurance. A COBRA Enrollment Package was mailed to Mr. Prassenos on May 31, 2012, which would have included the life insurance conversion notice. Mr. Prassenos had the right to convert the 1 x Pay of additional life insurance and the Spouse Life Insurance by contacting Prudential within 31 days of the loss.    Converted life insurance is maintained and premiums are collected directly by Prudential and would not have been part of the benefit provided by DuPont.    Mr. Prassenos was correctly enrolled in 1 x Pay of Employee Life Insurance that was provided by DuPont as part of the T&P plan; therefore, your request for coverage to be reinstated at a total of 2 x pay in Employee Life Insurance and/or to continue Spouse Life Insurance through DuPont is denied.

The DuPont Benefit Appeals Committee has reviewed your Level 2 appeal. Based on this review, a decision has been made to uphold Mylnfo's original denial.

This appeal was denied in accordance with page 3 of the 2008 Total and Permanent Disability Income Plan Summary Plan Description, If you become disabled and are not eligible for DuPont retiree benefits: Life Insurance -The Company provides continued life insurance equal to one times your pay, subject to age reductions at age 65, at no cost to you for as long as you receive Total and Permanent Disability Income payments. Any Contributory Group Life insurance or supplemental life insurance that you purchased under BeneFlex Employee Life Insurance is discontinued upon employment termination.

Please also reference page 8 of the 2008 BeneFlex Dependent Life Insurance Plan Summary Plan Description, When coverage ends: Your BeneFlex Dependent Life Insurance coverage ends on any of the following: 1. the end of the month that you are no longer eligible, 2. the end of the month that your covered dependent is no longer eligible. Records show that your husband separated from DuPont on June 1, 2012, under the provisions of the Total and Permanent Disability Income Plan. Once separated, he was neither eligible to be enrolled in any more than the 1 x Pay of BeneFlex Life Insurance nor eligible to maintain the Spouse Life Insurance with DuPont. Therefore, the Benefit Appeals Committee has determined that Mr. Prassenos was enrolled in the only life insurance benefit for which he was eligible and your request that he be enrolled in an additional 1 x Pay of Employee Life Insurance is denied, as is your request to continue Spousal Life Insurance through DuPont.

… this review by the Benefit Appeals Committee concludes your rights of appeal within DuPont and is considered final….

(Doc. 42-2 at 4-5).

On August 14, 2013, having exhausted her administrative remedies, Prassenos initiated this action for recovery of benefits and enforcement of rights under the *Employee Retirement Income Security Act of 1974*, 29 U.S.C. § 1001, *et seq.* (ERISA). (Doc. 1, 30). In so doing, Prassenos alleges: Count 1 against both Defendants for additional life insurance benefits Mr. Prassenos "was entitled to continue;" and Count 2 against only DuPont for breach of fiduciary duty as to both the additional life insurance benefits and the dependent life insurance benefits.

## II.    Conclusions of Law

### A.    Summary Judgment Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   Rule 56(c) provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

***(3) Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

***(4) Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).   The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).   If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment.   Celotex, 477 U.S. at 323.   "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter … the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992).

The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment.   See, e.g., Am. Bankers Ins. Group v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005); Gerling Global Reins. Corp. of Am. v. Gallagher, 267 F.3d 1228, 1233 (11th Cir. 2001).   "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law

on facts that are not genuinely disputed."   United States v. Oakley, 744 F.2d 1553, 1555 (11th

Cir. 1984) (citation omitted).   The Court is mindful that "[w]hen both parties move for

summary judgment, the court must evaluate each motion on its own merits,     resolving all

reasonable inferences against the party whose motion is under consideration."   Muzzy Prods.,

Corp. v. Sullivan Indus., Inc., 194 F.Supp.2d 1360, 1378 (N.D. Ga. 2002)).   The Court has

reviewed the facts submitted by each party and has made its own examination of the record.

The summary judgment analysis is "applied in a modified manner in an ERISA case."

Rogers v. Hartford Life and Accident, Ins. Co., 2012 WL 1288349, *1 at n.2 (M.D. Ala. Apr. 16,

2012) (citing Blankenship v. Met. Life Ins. Co., 644 F.3d 1350, 1354 at n. 4 (11th Cir. 2011)).

## B.   **ERISA Standard of Review**

ERISA provides no standard for courts reviewing the benefits decisions of plan

administrators or fiduciaries, Doyle v. Liberty Life Assur. Co. of Boston, 542 F.3d 1352, 1355

(11th Cir. 2008), but the Supreme Court established guidance for same in Firestone Tire &

Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989) and Metropolitan Life Ins. Co. v. Glenn, 554

U.S. 105 (2008).   More recently, the Eleventh Circuit has reiterated a multi-step framework to

guide lower courts when reviewing a plan administrator's benefits decision, and after Glenn, the

Eleventh Circuit no longer requires district courts to apply a heightened standard of review to a

conflicted plan administrator's decision (the sixth step).   Doyle, 542 F.3d at 1360.[14]   This

framework consists of the following "six-step expanded Firestone" test:

---

14  Now, "the existence of a conflict of interest should merely be a factor for the district court to take into
account when determining whether an administrator's decision was arbitrary and capricious." Doyle, 542 F.3d at
1360.   Thus, while this court "must take into account an administrative conflict when determining whether an
administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show the decision was
arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." Id.

1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5) If there is no conflict, then end the inquiry and affirm the decision.

6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Blakenship, 644 F.3d at 1355; Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1137 (11th Cir. 2004), *overruled on other grounds by* Doyle, 542 F.3d 1352. "All steps of the analysis are 'potentially at issue' where a plan vests discretion to the plan administrator to make benefits determinations.   Blakenship, 644 F.3d at 1356 at n.7.

Moreover, as set forth in Howington v. Smurfit-Stone Container Corp., 856 F.Supp.2d 1235, 1242-1243 (S.D. Ala. 2012) (case citations omitted) (emphasis added):

If there is a reasonable basis for the Plan Administrator's benefits decision, based upon the facts known at the time, it must be upheld as not an abuse of discretion or arbitrary or capricious, even where the evidence may support a different decision…"[W]here the administrator exercises discretion, deferential (i.e., arbitrary and capricious) review is appropriate according to trust principles, which guide review of decisions affecting ERISA-governed plans."…***To determine whether the Plan Administrator's decision was arbitrary and capricious, the Court begins with the language of the Pension Plan***. …

Pursuant to ERISA, the Plan Administrator's fiduciary duties are defined as the "prudent

man standard of care". 29 U.S.C. § 1104(a)(1)(A). The statute explains, in relevant part, that the "fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan[.]" 29 U.S.C. § 1104(a)(1)(A). ERISA also states that the fiduciary shall act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" and act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter." 29 U.S.C. § 1104(a)(1)(B) & (D).

The parties do not dispute that DuPont is the fiduciary plan administrator, vested with discretionary authority to determine eligibility for benefits, administer the plans, and construe the terms and conditions of the plans.    Therefore, assuming for purpose of this order that DuPont's decision is "*de novo* wrong," this Court must apply the arbitrary and capricious standard and determine whether Defendants had "a reasonable basis for the decision, based upon the facts as known to [it] at the time the decision was made."    Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989); Blankenship, 644 F. 3d at 1355; Firestone, 489 U.S. at 111; Hunt v. Hawthorne Assocs., Inc., 119 F.3d 888, 912 (11th Cir. 1997) ("We have interpreted *Firestone* to mandate an arbitrary and capricious standard of review, which is often used interchangeably with an abuse of discretion standard, if the administrator has discretionary authority to make eligibility determinations or to construe disputed terms of the plan[]").

Under ERISA, the plan administrator must discharge its duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D).   The terms of ERISA plans are vital -- "[a]written plan is ... required [so] that every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83-84 (1995). "One important duty

14

of an administrator is to determine if a beneficiary is eligible for benefits *under the plan*.   29

U.S.C. § 1102(b)(4), 1104(a) (emphasis added).

Here, Prassenos has the burden to establish that she is entitled to the plans' benefits – that

DuPont was wrong. Watts v. BellSouth Telecomms., Inc., 218 Fed. Appx. 854, 856, (11th Cir.

2007).   If Prassenos satisfies that burden, as DuPont has discretion, she must then demonstrate

the decision was arbitrary and capricious (that reasonable grounds do not exist to support the

decision).   Herring v. Aetna Life Ins. Co., 517 Fed. Appx. 897, 899 (11th Cir. 2013).

On summary judgment, the parties argue many facts and issues, including whether Mr.

Prassenos retired, or instead separated from ChemFirst (and/or DuPont) on disability (which was

not addressed during the administrative process); whether he/she failed to convert; whether

he/she failed to port; and whether those options were even available to him/her.   The Court has

waded through the administrative record, the issues framed by the parties, and the relevant

portions of the SPDs and plans, considered the varying contentions, and finds as follows.

**C.**     **Count 1 – Recovery of Additional Life Insurance Benefits (Section 1132(a)(1)(B))**
         **Against Both Defendants**

While employed with ChemFirst, Mr. Prassenos was a participant and insured under the

DuPont BeneFlex Life Insurance Plan (Life Insurance plan), a welfare plan per ERISA, that

provides group life insurance benefits.   (Doc. 30 at 3; Doc. 34 at 5-26 (SPD), 47-58 (full plan);

Doc. 42-2 at 72-92).   Mr. Prassenos designated Prassenos as his beneficiary.   (Doc. 30 at 3).

As set forth in the plan's SPD, life insurance coverage up to "1x pay" is provided at no

cost to employees, with the option for an employee to purchase his own *additional* insurance:

> … you can elect to purchase Beneflex Employee Life Insurance Plan coverage … The
> Company provides coverage of one times your pay at no cost to you, and you have the

15

option to purchase additional group term life insurance coverage with premium rates based on your age. The Plan also offers additional features, including … a feature that allows you to port your coverage if you leave the Company under certain conditions.

You will need to satisfy the requirement described in this SPD to receive BeneFlex Employee Life Insurance Plan coverage or benefit payment.

*** 

(Doc. 42-2 at 74, 77).[15]   Per the SPD, there are differing options for coverage, from which employees could select their benefit amounts (e.g., "1x pay" and higher for supplemental coverage).   (Id. at 78).   Mr. Prassenos purchased additional coverage -- the "2x pay" option.

DuPont's Level 2 denial of additional life insurance benefits is based on Mr. Prassenos' status as having separated from employment on disability under the T&P (the disability policy), with specific reliance on Page 3 of the T&P SPD (which states that supplemental life insurance is discontinued upon termination of employment).   DuPont then references (with little explanation) a 31 day conversion requirement, seeming to apply such to all of Prassenos' claims. DuPont's final basis for this denial is linked to the "When Coverage Ends" section of the Dependent Life Insurance SPD, for the proposition that Mr. Prassenos' separation on disability under the T&P rendered him ineligible for the additional and/or dependent coverage.

The Court's review of the record indicates that there is a provision of the Life Insurance plan that Defendants failed to address during the appeals process and which is dispositive to Count 1.   As explanation, the evidence supports that Mr. Prassenos separated from his employment on disability in June 2012, and in so doing, separated under the T&P.   Mr. Prassenos subsequently died in August 2012 (just over 2 months later).   The Life Insurance plan

---

15  According to the SPD, eligibility was conditioned on being: a Full-Service Employee of DuPont U.S. Region; a Full-Service Employee of a participating DuPont subsidiary or joint venture that has adopted this Plan; or a Pensioner or Survivor of a participating DuPont subsidiary or joint venture that has adopted this Plan for Pensioners and Survivors.   (Doc. 42-2 at 74).

16

provides as follows:

### XIII.   CESSATION OF EMPLOYMENT
***

3.   CESSATION OF EMPLOYMENT DUE TO TOTAL AND PERMANENT DISABILITY

**Each participating employee terminated due to total and permanent disability, as defined in the Company's Total and Permanent Disability Income Plan**…will become participants in this Plan and **shall continue to receive insurance coverage in the amount of coverage in effect up to one times Normal Annual Earnings at the time employment was terminated. The coverage will be provided by the Company.** ***Insurance coverage in excess of one times Normal Annual Earnings, if in effect at the time employment was terminated, will be paid to the beneficiary of the former employee if the former employee's death occurs within one year after the termination of employment.*** Such coverage shall continue until the end of the month in which the former employee is found to be no longer totally and permanently disabled, in accordance with the provisions of the Total and Permanent Disability Income Plan.

(Doc. 34 at 53-54) (emphasis added).

With the discovery of this provision, the Court ordered briefing by the parties on its applicability.   Defendants responded, conceding the applicability of section XIII.3 to Mr. Prassenos, and admitting that Prassenos' "additional benefits are payable under the Life Insurance Plan" due to this section.   (Doc. 67 at 2).   Defendants assert they "will process payment for the additional life insurance benefits" and allow for the "recovery of benefits claim under the Life Insurance Plan" (Count 1).   (Id.)

Given Defendants' concession and admittance of the applicability of Section XIII.3 of the Life Insurance plan, Defendants have admitted that their decision to deny Prassenos these benefits was *de novo* wrong.   This is because as a matter of law, the fiduciary shall administer the plan *in accordance with the documents and instruments governing the plan*. 29 U.S.C. § 1104(a)(1)(D) (emphasis added).   Egelhoff v. Egelhoff, 532 U.S. 141, 151 note 4 (2001).

17

Here, the plan administrator – admittedly -- failed to do so.  This means that the plan administrator's decision was *de novo* wrong, and because it was vested with discretion in reviewing claims, this Court must determine whether "reasonable" grounds supported it (e.g., review the decision under the more deferential arbitrary and capricious standard).  Upon consideration, and given the administrator's reliance on Mr. Prassenos' disability status and its current concession as to Section XIII.3, the Court cannot find that reasonable grounds existed to have denied the *additional* "1x pay" in light of the plain terms of the Life Insurance plan.  Additionally, Prassenos did not receive the full and complete Life Insurance plan from Defendants until long after her appeals process concluded – due to their unexplained 440 day delay in producing the requested plan documents – such that she was not in a position to raise the issue herself.   A fiduciary plan administrator who fails to apply an ERISA plan's plain language when making a benefits determination acts wrongly, and moreover, arbitrarily and capriciously.  See, e.g., Yochum v. Barnett Banks Inc. Severance Payment Plan, 234 F.3d 541, 547 (11th Cir. 2000) (discussing the plain meaning requirement the administrator must adhere to and that the denial of an ERISA claim "based on … incomplete information was arbitrary and capricious, in that the plain language of the Plan and the Agreement were violated[]").

Thus, it is **ORDERED** that Prassenos' motion for summary judgment is **GRANTED** as to Count 1 and that this count will be **CARRIED TO TRIAL** solely to determine the amount of final judgment (including attorneys' fees and interest)**.**[16]

---

[16] There is no need to reverse/remand the decision for further administrative review because there is no dispute that the denial of benefits was improper and the amount of benefits Plaintiff shall be paid may be made determinable by this Court via trial on damages.

**D.**     **Count 2 - Breach of Fiduciary Duty (Section 1132(a)(3))**[17]  **Against DuPont**

1.     Dependent Life Insurance

While employed with ChemFirst, Mr. Prassenos obtained a DuPont BeneFlex Dependent Life Insurance Plan (Dependent Life Insurance plan) for Prassenos, making her a participant and insured under this plan (with Mr. Prassenos as her beneficiary).   (Doc. 30 at 3; Doc. 34 at 30-45 (SPD), 60-64 (full plan); Doc. 42-2 at 93-108).  The SPD and plan both provide that there is choice of dependent coverage amounts for spouses ranging from $10,000 to $350,000. (Doc. 42-2 at 100; Doc. 34 at 62).[18]   Mr. Prassenos selected $100,000 coverage for Prassenos. Ultimately, Mr. Prassenos pre-deceased Prassenos, who is also now deceased.

Prassenos contends that as Mr. Prassenos' spouse, upon his termination of employment she was entitled to have DuPont *continue* her coverage under the Dependent Life Insurance plan ($100,000 worth) without having to convert such to an individual policy or pay premiums. Prassenos asserts that because Mr. Prassenos retired on disability, any requirement he had to port to continue the coverage on Prassenos was waived.   As grounds for her claim, Prassenos references DuPont's November 2, 2012 Level 2 denial of appeal and contends that the decision was wrong because it failed to apply the plain language of certain sections of the Dependent Life SPD ("When Coverage Ends," "If you leave the Company," "Applying for the portability feature").   (Doc. 30 at 8-9).   Specifically, Prassenos alleges as follows:

---

17 While DuPont couches Prassenos' argument as one for individualized notice, it is not, and such an issue is simply not before the Court in this case and will not be addressed further.

18 The SPD explains eligibility as: a Full-Service Employee of DuPont U.S. Region; or a Full-Service Employee of a participating DuPont subsidiary or joint venture that adopted this Plan.   (Doc. 42-2 at 95).   The Dependent Life Insurance plan clarifies that employees are eligible without regard to length of company service and dependents shall become eligible under the plan only when the dependent is enrolled as a dependent by the employee.   (Doc. 34 at 62).

15.     The summary plan description of the 2008 BeneFlex Dependent Life Insurance states on page 8: "With some restrictions, your spouse/partner may be eligible to apply for coverage under the portability feature of the Plan if your coverage ends for reasons other than disability."   On the following page 9, the summary plan description states: "Portability is a feature of the Plan that allows your spouse/partner to obtain similar group term life insurance coverage after you terminate, or coverage ends due to your death or divorce. Your spouse/partner and children may port coverage only if they are already covered under the Plan and, in certain cases, only if you elect to port your coverage as well. **The requirement that you also port your coverage is waived in the cases of retirement, death, divorce, if you terminate employment under the terms of the Total and Permanent Disability Income Plan or a voluntary or involuntary termination incentive."** (Emphasis Added)….

16.     The summary plan description of the BeneFlex Dependent Life Insurance Plan, Exhibit "C", states on page 8 that a spouse may apply for coverage under the portability feature "if your coverage ends for reasons other than disability," but on the next page the summary plan description states, "Portability is a feature of the Plan that allows your spouse/partner to obtain similar group term life insurance coverage after you terminate, ... **The requirement that you also port your coverage is waived in the cases of retirement, .. .**" (Emphasis Added).

(Doc. 30 at 8-9 (emphasis added by Plaintiff)).   However, Plaintiff misinterprets the waiver. The requirement that is waived is the requirement that Mr. Prassenos <u>also</u> port <u>his</u> coverage in order for the spousal (dependent) coverage to be portable.   There is no waiver for Prassenos to proactively port her coverage for it to continue.

In response, DuPont contends, referencing the Dependent Life Insurance plan, that Prassenos was required to pay the premium <u>and</u> either convert or port the coverage to continue same (Doc. 51 at 5-6) to keep her dependent coverage, based on the following:

1.     *Any insurance under this Plan shall be cancelled automatically at the end of the month (a) the employee ceases to be an employee of the Company* or (b) the employee discontinues the payment for coverage.

2.     *In the event of termination of the dependent's coverage as a result of the employee's death*…or *termination of employment due to retirement, disability*…the employee under this Plan *may have the privilege* of applying to transition coverage without medical examination to a similar term life insurance policy as customarily issues

20

by the Insurance Carrier. ***Application to port coverage must be made directly to the Insurance Carrier within 31 days after cancellation of coverage*** under this Plan and the first premium payment must be made within 31 days of the date on the first bill. This privilege applies only to insured spouses under age 70 … on the day the coverage ends.

(Doc. 34 at 64 (emphasis added)).

The Court finds that DuPont's interpretation of the Dependent Life Insurance plan is not *de novo* wrong.   Mrs. Prassenos was required to apply for coverage with the insurance carrier (Prudential) within 31 days of June 30, 2012.   This she did not do.

However, Prassenos' claim is not dependent on the correctness of DuPont's decision. Rather, based on a June 1, 2012 letter from DuPont entitled "Confirmation of Lost Coverage," Prassenos asserts a breach of fiduciary duty claim against DuPont pursuant to 29 U.S.C. § 1132(a)(3), which provides that "[a] civil action may be brought ... by a participant, beneficiary, or fiduciary ... to obtain [] appropriate equitable relief ... to enforce any provisions of this subchapter or the terms of the plan[.]" 29 U.S.C. § 1132(a)(3). The fiduciary duties imposed by ERISA provide:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104(a)(i)(A) & (B).   Additionally, as enunciated in Jones v. American General Life and Acc. Ins. Co., 370 F.3d 1065, 1072 (11th Cir. 2004):

> In *Ervast v. Flexible Prods. Co.,* 346 F.3d 1007 (11th Cir.2003), we recognized that an ERISA participant has a right to accurate information, and that an ERISA plan administrator's withholding of information may give rise to a cause of action for breach of fiduciary duty. *Id.* at 1016 n. 10. Our sister circuits have reached the same conclusion, consistently holding that ERISA plan participants may state a cause of action for breach

of fiduciary duty based on a plan administrator's material misrepresentations or omissions. *See, e.g., Unisys,* 57 F.3d at 1265–69 (holding that participants in an ERISA-governed plan had stated a claim for breach of fiduciary duty based on the plan administrator's repeated assurances that plan benefits could not be terminated after their retirement); *Howe,* 36 F.3d at 753 ("'Misleading communications to plan participants regarding plan administration will support a claim for breach of fiduciary duty.'") (internal alterations omitted) (quoting *Berlin v. Michigan Bell Tel. Co.,* 858 F.2d 1154, 1163 (6th Cir.1988)); *Mullins v. Pfizer, Inc.,* 23 F.3d 663, 669 (2d Cir.1994) (holding that a plan administrator's affirmative material misrepresentations about proposed future changes to an ERISA-governed plan are actionable as a breach of fiduciary duty under ERISA); *Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1300–01 (3d Cir.1993) (holding that an ERISA fiduciary's duty to provide "complete and accurate information" to its beneficiaries "entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful"), *quoted in Ervast,* 346 F.3d at 1016 n. 10; *Drennan v. General Motors Corp.,* 977 F.2d 246, 251 (6th Cir.1992) ( "Misleading communications to plan participants regarding plan administration (for example, eligibility under a plan, the extent of benefits under a plan) will support a claim for a breach of fiduciary duty.") (internal quotations omitted).

In Count II, Prassenos alleges that DuPont, as the administrator of the plans, "breached its fiduciary duty to [her] by misleading both Mr. Prassenos and [her] with incomplete and inaccurate information [in that letter] regarding the terms" of the plans. (Doc. 30 at 13 at ¶32). Prassenos alleges that, as a result of the breach, she was injured in the form of: 1) the loss of the life insurance proceeds on the lives of both Mr. Prassenos and herself; and 2) loss of earnings on the loss of the life insurance proceeds, including interest on the benefits on the life of Mr. Prassenos that should have been previously paid to her.   (Id. at 14 at ¶35).   Prassenos also seeks "[t]he equitable remedy of surcharge...in the form of an award of monetary compensation against [DuPont].   (Id. at 13 at ¶ 33).

On summary judgment, and as grounds, Prassenos contends: 1) the letter did not contain any information about continuation or conversion of coverage; 2) the letter did not contain the name of the insurance company, Prudential Insurance Company of America; 3) the letter stated

they "may be able to continue group health coverage for yourself and any covered dependents under COBRA[;]" 4) the letter "did not also include any information that the insurance could be maintained" by paying a "relatively nominal premium and notifying…Prudential…[]" instead stating that the life insurance and dependent life insurance coverage terminated on May 31, 2012; and 5) that the date that coverage terminated was incorrect, that it was neither May 31, 2012 nor effective June 1, 2012 as DuPont claims, but was July 31, 2012. (Doc. 30 at 9-10). Prassenos alleges that she was harmed by this fiduciary breach by having to litigate the issue of additional coverage on her husband and also on her life insurance. Prassenos asserts that reinstatement of her dependent life insurance policy in the amount of $100,000 is the appropriate equitable remedy. Prassenos also seeks as relief, the life insurance proceeds for both she and Mr. Prassenos, earnings on those lost proceeds (including interest on the additional benefits due under Mr. Prassenos' plan), and an equitable remedy of a surcharge.

DuPont responds that "Plaintiff or Mr. Prassenos via the summary plan descriptions, were given clear instructions on how to continue the life insurance coverage. As a result, Defendants are entitled to summary judgment on the breach of fiduciary duty claim."

The Court disagrees because the Dependent Life Insurance SPD, relied upon by DuPont to defeat summary judgment, indicates that Mrs. Prassenos was not eligible to port her dependent coverage because Mr. Prassenos' coverage ended based on disability. Specifically, the Dependent Life Insurance SPD provides:

> *If you leave the Company*
> Your BeneFlex Dependent Life Insurance **coverage ends at the end of the month in which you leave the Company, for any reason, including retirement.**
>
> With some restrictions, **your spouse**/partner **may be eligible to apply for coverage under**

23

**the portability feature** of the Plan **if your coverage ends <u>for reasons other than disability.</u>**

***

*When coverage ends*
Your Beneflex Dependent Life Insurance coverage ends on any of the following:
• the end of the month that you are no longer eligible
• the end of the month that your covered dependent is no longer eligible

**With some restrictions, your spouse/partner may be eligible to apply for coverage under the portability feature** of the Plan **if you are no longer eligible** for the group coverage **<u>for reasons other than disability.</u>**

(Doc. 34 at 39 (emphasis added) (Page 8 of the Dependent Life Insurance SPD)).

However, as relied upon by DuPont to deny coverage, the Dependent Life Insurance plan

provides:

1.      **Any insurance under this Plan shall be cancelled automatically at the end of the month (a) the employee ceases to be an employee of the Company** or (b) the employee discontinues the payment for coverage.

2.      **In the event of termination of the dependent's coverage as a result of the employee's death**…or **termination of employment due to retirement, disability**…the employee under this Plan **may have the privilege** of applying to transition coverage without medical examination to a similar term life insurance policy as customarily issues by the Insurance Carrier. **Application to port coverage must be made directly to the Insurance Carrier within 31 days after cancellation of coverage** under this Plan and the first premium payment must be made within 31 days of the date on the first bill. This privilege applies only to insured spouses under age 70 … on the day the coverage ends.

(Doc. 34 at 64 (emphasis added) (Page 4 of the Dependent Life Insurance plan)).

Thus, even if Prassenos was provided the Dependent Life Insurance SPD, she was given

incorrect information.   Moreover, the letters did not provide information regarding porting

Prassenos' coverage.   There is no dispute that neither Mr. Prassenos nor Prassenos were timely

provided the actual plan with the correct information.   DuPont has presented no other evidence

that the correct information was timely provided to either Mr. Prassenos or Prassenos.

24

Accordingly, the Court finds -- as to Count 2 (breach of fiduciary duty for the dependent life insurance benefits) -- that DuPont's motion for summary judgment is **DENIED;** and Prassenos' motion for summary judgment against DuPont is **GRANTED** and that this count will be **CARRIED TO TRIAL** solely on the amount of damages to be awarded to plaintiff.

   **DONE** and **ORDERED** this the **16**[th] day of **January 2015.**

                    /s/ Kristi K. DuBose
                    **KRISTI K. DuBOSE**
                    **UNITED STATES DISTRICT JUDGE**